**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

JOHN BROWN                                                                          PETITIONER

v.                                            5:16cv00381-BRW-JJV

WENDY KELLEY, Director,
Arkansas Department of Correction                                    RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Billy Roy Wilson.  Any party may serve and file written objections to this recommendation.  Objections should be specific and should include the factual or legal basis for the objection.  If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection.  An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations.  The copy will be furnished to the opposing party.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before either the District Judge or Magistrate Judge, you must, at the time you file your written objections, include the following:

1.        Why the record made before the Magistrate Judge is inadequate.

2.        Why the evidence to be proffered at the new hearing (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.    The details of any testimony desired to be introduced at the new hearing in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the new hearing.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing.  Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## I.    BACKGROUND

### A.    Procedural History

After an April 1992 mistrial resulting from a "hung jury," a Dallas County jury in August 1992 found Petitioner John Brown guilty of the murder and aggravated robbery of Myrtle Holmes. (Doc. Nos. 1 at 2, 11-8 at 953.)  Mr. Brown was tried alongside two co-defendants, Reginald Early and Tina Jimerson.  (*Id*.)  Another co-defendant, Charlie Vaughn, pleaded guilty before trial to murder in the first degree.  (*Id*.)  All four co-defendants were sentenced to life in prison.  (Doc. No. 1 at 3.)

Defendants Brown, Early, and Jimerson appealed their convictions, arguing to the Arkansas Supreme Court that the trial court erred:  1) in denying a motion for a directed verdict over Vaughn's testimony not being corroborated; 2) by not granting a motion to dismiss because of a procedural delay in filing the charges; 3) in refusing to exclude any testimony about any subject not included in the statement; and 4) for not directing a verdict in their favor based on the insufficiency of the evidence to sustain their convictions.  *Brown v. State*, 315 Ark. 466 (1994). However, the Arkansas Supreme Court affirmed their convictions after finding these claims meritless.  *Id*.  In affirming, the Arkansas Supreme Court stated:

Myrtle Holmes was found murdered on September 22, 1988. The evidence at the scene showed that she had been beaten and stabbed while inside her home and that her body was then placed in the trunk of her car. A year and one-half later, on March 16, 1991, the State charged Charlie Vaughn, and appellants John Brown, Jr. and Reginald Early, with capital murder in three separate informations. A little over a week later, on March 25, 1991, Charlie Vaughn pleaded guilty to murder in the first degree and was sentenced to life in prison. Vaughn's guilty plea implicated appellants Brown and Early and also implicated appellant Tina Jimerson. On March 27, 1991, appellant Tina Jimerson was charged as an accomplice in a separate information. On July 12, 1991, the State moved to consolidate the cases since all three would require proof of the same facts. On July 19, 1991, separate defendant Tina Jimerson objected to consolidation, and, at the same time, moved for a severance. In an order dated July 17, and entered on July 23, 1991, the trial court ordered the cases consolidated for trial purposes. A jury trial ended in a mistrial. The informations were amended to charge appellants with first degree murder and aggravated robbery. A jury returned verdicts of guilty for all three appellants on both charges and sentenced each to life in prison on both of the charges. Appellants Early and Jimerson, together, have filed an appeal, and appellant Brown has filed a separate appeal. We have consolidated the appeals and address all assignments of error in this one opinion. There is no reversible error, and we affirm the three judgments of conviction on both charges.

*Brown v. State*, 315 Ark. 466, 468–69 (1994).

In addressing the insufficiency of the evidence claim, the Court said:

Here, there is substantial evidence of both crimes. Charlie Vaughn pleaded guilty to the murder, and at the time of his plea, testified that the three appellants "wanted to do a robbery." He said appellant Jimerson drove the foursome to the victim's home where appellant Brown entered through a window and let appellants Early and Vaughn inside. Jimerson remained in the car. Vaughn further testified that they looked for and found money which they took. He stated that appellant Brown beat the victim, an elderly woman, with pots and pans and then raped her. He said he and appellant Brown then raped her, and appellant Brown slit her throat. Vaughn testified that he and Brown then took the body and placed it in the trunk of the victim's car. In addition, Darrell Jenkins testified that appellant Early told him that he had killed the victim by hitting her with pots and pans and stabbing her. Michael Early's testimony placed appellant Early near the scene close to the time the crime was committed. The testimony of three other witnesses, Taura Bryant, Lee Parsons, and Kenny Parsons, placed the three appellants together on the night of the crime, with appellant Jimerson driving the group. Without question, the foregoing constitutes substantial evidence of the crimes for which appellants were convicted.

*Id.* at 471.

3

Mr. Brown did not seek any further post-conviction relief from the Arkansas state courts. (Doc. No. 1.)

On December 21, 2016, Mr. Brown filed the instant Petition for Writ of Habeas Corpus wherein he alleges six claims: (1) actual innocence; (2) a violation of due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963); (3) a violation of due process rights under *Arizona v. Youngblood*, 488 U.S. 51 (1988); (4) a violation of due process from failure to disclose additional interviews and/or incentives that witnesses Ellis Tidwell and Kenny Parsons received in exchange for testifying; (5) a violation of due process when the prosecutor failed to correct false evidence; and (6) multiple instances of ineffective assistance of counsel violating Brown's Sixth and Fourteenth Amendment rights. (Doc. No. 1.)

On September 11 and 12, 2017, I held an evidentiary hearing to address Mr. Brown's Petition. (Doc. Nos. 16, 37, 38.) Immediately after the hearing, Petitioner filed a Motion for Order to Authorize Discovery, Compel a Search for Evidence, and Order DNA Testing. (Doc. No. 33.) The parties also requested additional time to file post-hearing briefs and those briefs were filed on December 22, 2017. (Doc. Nos. 42-44.) The matter is now ripe for a determination.

After carefully considering the evidence in this matter, for the following reasons, I find Mr. Brown's Petition should be DISMISSED with prejudice and no certificate of appealability should issue.

**B.    Facts**[1]

On September 22, 1988, the body of Myrtle Holmes was discovered hidden in the trunk of her car, which was parked at her residence in Fordyce, Arkansas.  (R. 669.)[2]  When police responded to the scene, they found the inside of the house ransacked and blood all over the walls and floor.  (R. 670.)  Several knives were discovered in the residence, including one with a broken handle on the living room floor.  (R. 669-670.)  A trail of blood went from the master bedroom, through the kitchen, and out through the utility room that lead into the carport, where Ms. Holmes's car was parked.  (R. 671.)

Ms. Holmes's body revealed multiple stab wounds and a slit throat.  (R. 824.)  DNA was collected from vaginal swabs taken from her body.  (Doc. 11-3 at 531.)  Law enforcement later determined Ms. Holmes had been raped.  (Doc. 11-3 at 474.)

Charlie Vaughn, Reginald Early, and John Brown, Jr. were all charged with the capital murder of Ms. Holmes.  (Doc. 11-3 at 10.)  But due to the complexity of the investigation, the State did not file charges until March 1990 - nearly two years later.  (*Id*.)

While not disclosed to the defense, Charlie Vaughn was confronted by a police informant named Ronnie Prescott in March 1991 while in jail awaiting trial.  (Doc. 1 at 290.)  Mr. Prescott was fitted with a small tape recorder and told to talk to Mr. Vaughn about the murder of Myrtle Holmes in order "to see what information [he] could gather from him."  (*Id*. at 291.)  Mr. Prescott recorded several conversations with Mr. Vaughn over the course of a few days in which Vaughn

---

[1] This Recommendation provides a brief recitation of the relevant facts surrounding the murder of Myrtle Holmes. For a more detailed account of all the circumstances surrounding the victim's death, see the Proposed Findings and Recommendations from Petitioner Tina Jimerson's related case, *Jimerson v. Kelly*, 5:15CV00208 BSM-JTK.

[2] Citations to the Record on Appeal, Respondent's Exhibit 11, appear as "R.__". Citations to the evidentiary hearing appear as "Tr. __".

apparently confirmed involvement in the murder. These recordings, however, were never provided to the defense and no longer exist. (*Id.* at 308.) The day after his interactions with Mr. Prescott, Mr. Vaughn entered a plea of guilty and claimed that John Brown, Jr., Reginald Early, and Tina Jimerson had all participated in the murder with him. *Brown v. State*, 315 Ark. at 468. Mr. Vaughn later recanted this confession when testifying at the trial of Mr. Early, Mr. Brown, and Ms. Jimerson. (Doc. No. 1 at 141). Despite this, all three were found guilty of first degree murder and aggravated robbery and sentenced to life in prison. *Brown v. State*, 315 Ark. at 468.

In 2012, Reginald Early began working with the Innocence Project in an attempt to vindicate himself from the murder of Ms. Holmes. (Doc. No. 1 at 20). However, after the Innocence Project eventually filed a motion to have the DNA collected from Ms. Holmes retested with modern scientific techniques, Reginald Early abruptly confessed to having killed Ms. Holmes. Mr. Early now claims he was the sole perpetrator of the rape and murder of Myrtle Holmes – purportedly vindicating Petitioner John Brown, Jr. (*Id.*)

## II.    EVIDENTIARY HEARING

At the hearing, Petitioner presented evidence from eleven witnesses: Reginald Early, Karen Thompson, Kenny Parsons, Lee Parsons, Lateefah Abdullah, Ellis Ray Tidwell, Robert Jeffrey, Terri Childs, Patsy Lou Harris, Michael Earley, and Shannon Manning. Respondent did not call any witnesses.

### A.    Reginald Early

Mr. Early testified that he was born and raised in Fordyce, Arkansas. (Tr. 6.) He spoke about the trials that resulted in his incarceration and indicated that the first trial for capital murder and rape resulted in a mistrial. (Tr. 8.) At the first trial, the prosecution presented DNA evidence implicating only Mr. Early in the rape of Ms. Holmes. At the retrial, the prosecution chose not to

present the DNA evidence and the defense for all three defendants made the strategic choice to also not present that evidence. For the second trial, the charges were reduced to first-degree murder and aggravated robbery. (*Id.*)

Mr. Early said he was picked up by the police the next day and only hours after the murder occurred. Police officers told him they needed to speak to him because "something had been broken into and they was looking into that." (*Id.*) He was taken to the police station and a handprint sample was given. (Tr. 10.) Police also interviewed Mr. Early and made no mention of John Brown, Tina Jimerson, or Charlie Vaughn. (*Id.*)

In the hearing, Mr. Early claimed he did not associate with any of his co-defendants. In fact, he testified he had never seen John Brown before in his life. (Tr. 13.) While he knew Tina Jimerson through school and family, he did not spend any time with her. (*Id.*) Similarly, he knew Charlie Vaughn through playing football together, but never had any sort of relationship with him. (Tr. 14.) Mr. Early testified that at the time of his trial, he knew all three of his co-defendants were innocent because he "had committed the crime by [himself]." (*Id.*) When asked why he pleaded not guilty if he knew he had committed the murder, Mr. Early responded, "Because of what I was charged with. I was charged with committing a crime with people that I knew hadn't committed no crime, so I had to be just as innocent as they was." (Tr. 16.)

Mr. Early was presented with the affidavit he wrote on December 21, 2015, which detailed how he committed the crime alone. (Tr. 17.) He testified that before creating and signing the affidavit with his attorney, he never told anyone that he alone had killed Myrtle Holmes. (*Id.*) While he originally applied to the Innocence Project on behalf of his co-defendant, Charlie Vaughn (Tr. 18), that application eventually lead to Early's confession on which Mr. Brown bases his current Petition.

On cross examination, Mr. Early testified that he dropped out of school after the ninth grade and proudly remarked, "I ain't never worked in my life." (Tr. 28.) Rather, he regularly burglarized and "Stole, took" as his source of income. (*Id*.) Mr. Early testified that he ended up in jail at the age of sixteen or seventeen after getting into an altercation with his girlfriend. (Tr. 33.) A deal was worked out with the local authorities at the time where Mr. Early would stay out of prison as long as he never returned to Fordyce, with the exception of family emergencies. (*Id*.) Mr. Early testified, "So the sheriff, he didn't -- you know, I was young, and the sheriff kind of felt like my uncle would have been a bad influence on me, and he asked the sheriff – called my mother and said, 'If I can get him out of this jail, can you get him out of town and not come back?' Talking about me." (*Id*.) Subsequently, Mr. Early moved in with his paternal grandmother in Detroit, Michigan. (*Id*.) When asked what he did in Detroit, Mr. Early responded with, "I ran the streets." (*Id*.)

Mr. Early returned to Fordyce upon the death of his other grandmother a few months later. (Tr. 44.) On September 20, 1988, the day before his grandmother's funeral, Mr. Early began drinking and "walking through the town after the last liquor store closed, around 10 p.m." (Tr. 45.) After walking through the town, Mr. Early arrived at the intersection where Myrtle Holmes lived and decided to "get even with her" for calling the police on him earlier in the day for kicking over some signs. (Tr. 45.)

Mr. Early testified that he entered Ms. Holmes's residence through an unlocked side door in the carport. (Tr. 46.) After walking through the house, he came upon Ms. Holmes asleep in the back bedroom. (Tr. 47.) When she woke up and began to panic, he told her that he was "just there for money." (Tr. 47-48.) After finding $240 in a chest of drawers in the bedroom, Mr. Early accused Ms. Holmes of lying about not having more money in the home. (Tr. 48.) When he began

to search for more money, Ms. Holmes got out of bed and ran towards the living room. (*Id*.) Mr. Early tackled her onto the living room couch. (*Id*.) According to Mr. Early, this opened up a previous surgical wound on Ms. Holmes, accounting for the blood stains on the couch. (*Id*.)

Mr. Early said he ushered Ms. Holmes back to her bedroom and began to search for money again. (Tr. 50.) He found none and decided to tie up Ms. Holmes with a thin piece of fabric so she could not alert the authorities. (*Id*.) Instead of letting Mr. Early tie her up, Ms. Holmes grabbed an empty pot off a nearby table and "started to swing it at [him] with all her might." (Tr. 51.) Mr. Early tackled her to the ground, punched her in the face "around five or six times," and then raped her. (*Id*.) Mr. Early put her back on the bed and Ms. Holmes began hitting him again. (*Id.*) Mr. Early testified that he began to get frustrated at this point and grabbed three knives from the kitchen. (Tr. 52.) Upon seeing the knives in Mr. Early's hand, Ms. Holmes started running towards the front door. (*Id.*) Mr. Early tackled her to the floor in the living room and stabbed her five or six times in the back. (Tr. 54.) He said that he tried to cut her throat but did not think that wound was very deep. (*Id*.)

When she stopped moving, he "took her feet and dragged her through the living room, through the bedroom, through the kitchen and out the carport door." (*Id.*) Mr. Early indicated that dragging her through the house accounted for the trail of blood that was found. (Tr. 55.) Mr. Early indicated he found a set of keys and attempted to start the car, but it would not start. (Tr. 56.) After that, he placed the body of Myrtle Holmes in the trunk of the car and was careful not to get blood on him. (Tr. 56-57.) He left the carport between 11:15 and 11:30, and threw the car keys into the woods to the right side of the house. (Tr. 57.)

Mr. Early was asked how the co-defendants, specifically Charlie Vaughn, would know details about the crime scene without ever having been there. (Tr. 90.) Mr. Early responded that

the police must have told him about the crime scene. (*Id*.) Mr. Early also denied the validity of Charlie Vaughn's confession, which indicated that it was Mr. Vaughn and Mr. Brown that placed the body of Myrtle Holmes into the trunk of her car. (Tr. 91.)

Mr. Early testified that he was engaged by the Innocence Project in 2012. (Tr. 119.) About his thoughts of claiming innocence when he was actually the murderer, Mr. Early testified, "I'm in prison for being an accomplice to a crime I committed, and that was what I was telling the Innocence Project. That's what I told them. I was saying, hey, man, I ain't no accomplice. You know what I'm saying? From what I knew from my self-teachings, you know, I just felt like I was just as wronged as [Brown and Jimerson] was." (Tr. 116-117.)

He said that he wanted to admit to acting alone to his Innocence Project attorney from the beginning, but was unclear on whether the attorney-client privilege would extend to the speakerphone conversation he was having with his attorney and other paralegals. (Tr. 120.) Mr. Early stated:

> I wasn't crystal clear about the attorney-client privilege, so I chose not to say nothing then. And I didn't want to seem shady to those other people in that room by saying, "Hey, just let me talk to you alone," and then they're sitting there at the table thinking, hey, we trying to help you, too. And I didn't want to seem shady in front of them, so I decided I'd just wait till I get her alone.

(*Id.*)

After finding out the Innocence Project was close to filing the motion to re-test the DNA evidence, he made multiple attempts to get his attorney alone on the phone. (Tr. 121.) When he finally got her on the phone alone, Mr. Early said that he admitted to being the only person involved in the murder of Myrtle Holmes. (*Id*.) I said, "Ma'am, everything I told you is the truth, but -- I did commit the crime, but I committed it by myself."

### B.    Karen Thompson

Karen Thompson testified that she is the senior staff attorney at the Innocence Project and has been with the organization for five years.  (Tr. 140.)  She had represented Reginald Early until he called her on October 27, 2015, and confessed to the rape and murder of Myrtle Holmes.  (Tr. 143-144.)  The confession came less than a week after she had filed a motion for post-conviction DNA testing.  (Tr. 145.)  After Mr. Early gave his confession, she quickly filed a motion to withdraw that motion.  (Tr. 147.)

Ms. Thompson said she flew down to visit with Mr. Early in prison on November 4, 2015. (Tr. 149.)  Over the four hours of their meeting, Ms. Thompson went through his confession with him and spoke about the extent of her representation.  (*Id.*)  After the meeting, she put her notes together into an affidavit, which Mr. Early reviewed and signed.  (Tr. 151.)  Not until she returned to New York on December 22, 2015, did she alert any of Mr. Early's co-defendants of his confession.  (Tr. 156-157.)

Ms. Thompson went on to explain the DNA testing process and how the original DNA test done in Mr. Brown's case was "literally the most primitive form of forensic DNA testing."  (Tr. 153.)  Even with that primitive type of testing, Mr. Brown and Mr. Vaughn were excluded as possible matches to the spermatozoa that was collected.  (Tr. 153-154.)  The testing also indicated that the collected DNA was only from one source.  (Tr. 156.)

On cross examination, Ms. Thompson indicated it was common practice for her to have someone in the room with her when she spoke with Mr. Early on the phone.  (Tr. 160.)  She also testified that Mr. Early never expressed any concern with their attorney-client privilege to her, but he might have been confused about who was covered under it.  (Tr. 161.)  She also testified that

the only communication with Mr. Early between the time she filed the motion for further DNA testing and the time he confessed was sending him a copy of the motion.  (Tr. 162.)

### C.    Kenny Parsons

Kenny Parsons was a witness at the trial in which Mr. Brown was convicted in 1992.  At the evidentiary hearing, Kenny Parsons testified he had no recollection of testifying in that trial.  (Tr. 172.)  He recounted that he was heavily using crack cocaine and other drugs at the time.  (*Id.*)  He also indicated he has been diagnosed with paranoid schizophrenia and depression.  (*Id.*)  From the period of 1988 to 1992, he said he cannot remember much.  (Tr. 173.)  Kenny testified he checked into a rehabilitation facility in 1994 after attempting to commit suicide by setting himself on fire.  (Tr. 172-173.)

### D.    Lee Parsons

Lee Parsons is the brother of Kenny Parsons.  (Tr. 177.)  Lee testified that he was acquainted with all four defendants in this case.  (Tr. 178-179.)  He also said he did not recall any of the defendants ever hanging out with each other.  (Tr. 180.)  He could not remember seeing John Brown ever wearing bloody clothes at his house.  (Tr. 181.)  Lee candidly told counsel that he had been to jail in Fordyce six or seven times and that his father oversaw the trustee program at the jail.  (Tr. 180-181.)

On cross examination, Lee admitted he could not recall testifying in both of Mr. Brown's trials, even though the transcripts indicated he had.  (Tr. 183.)  He also admitted to drug use from 1988 to 1991.  (Tr. 185.)

### E.    Lateefah Abdullah

Lateefah Abdullah, Mr. Brown's cousin, testified by phone.  (Tr. 187.)  Ms. Abdullah stated she lives in Washington State and works with men and women who have been held in federal

correctional facilities. (*Id.*) She is currently getting a master's degree in criminal justice with a concentration in investigative criminology. (*Id.*)

Ms. Abdullah testified she had not seen Mr. Brown since she was two years old, but has retained a close relationship with him since 2005. (Tr. 187-188.) Before 2005, her late grandfather stayed in contact with Mr. Brown, specifically remembering an instance where Mr. Brown was hospitalized for a stab wound in 1988. (Tr. 188.) In the early 2000s, Ms. Abdullah's grandfather kept in communication with Mr. Brown regarding money. (*Id.*) According to Ms. Abdullah, Mr. Brown told her grandfather he was innocent. (*Id.*)

Mrs. Abdullah testified she came across a letter from Mr. Brown that was written to her grandfather while helping to box up her grandfather's belongings. (Tr. 189.) In the letter, Mr. Brown "professed his innocence of the crime he's been incarcerated for." (*Id.*) After finding the letter, Ms. Abdullah contacted Mr. Brown by letter in 2005. (Tr. 190.) In her first letter, she wrote, "the birds are about to fly the nest," which, according to her, meant she was going to assist Mr. Brown in proving his innocence. (*Id.*)

Over the course of her involvement, Ms. Abdullah said she wrote letters to each of Mr. Brown's co-defendants and received a response from Reginald Early and Tina Jimerson. (Tr. 193.) She began communicating with Mr. Early via telephone and letter on a consistent basis from 2005 to 2007. (*Id.*) In a 2005 letter from Mr. Early, he writes they did not commit the crime, so he was unable to give any details about it. (Tr. 195.) Additionally, Ms. Abdullah testified that she sent transcripts and money to Mr. Early and his family. (Tr. 197.) The last time she corresponded with Mr. Early was in early 2016, after finding out that Mr. Early had confessed to being the sole perpetrator of the crime. (Tr. 198.)

Ms. Abdullah testified she received many documents throughout the course of her investigation, including trial transcripts and medical records. (Tr. 200-201.) She sent requests to several journalists, attorneys, and government agencies in an attempt to gain their support in proving Mr. Brown's innocence, with little success. (Tr. 202-206.) Finally, the Innocence Project placed Mr. Brown on a waitlist after Ms. Abdullah filled out an application for him. (Tr. 207.)

### F.    Ellis Ray Tidwell

Ellis Ray Tidwell is a long-time resident of Fordyce, Arkansas. (Tr. 211.) Mr. Tidwell testified he has been friends with Fordyce Sheriff Donny Ford and Chief of Police Ronnie Pool for most of his life. (Tr. 213.) In April 1989, Mr. Tidwell was sentenced to twenty years in the Arkansas Department of Correction for selling cocaine. (Tr. 214.) Two years later, he was released and became a jail trustee under Sheriff Donny Ford. (*Id.*) Mr. Tidwell said he was approached by Investigator Michael Joe Earley, and he asked about the murder of Myrtle Holmes. (Tr. 216.) On this occasion, he told Mr. Earley he did not want to get involved and refused to talk to him. (Tr. 216-217.)

Mr. Tidwell testified he initiated the second interaction with Mr. Earley around the time of the second trial. (Tr. 217.) He told Mr. Earley that Charlie Vaughn and two or three other people came to his house late the same night Ms. Holmes was murdered. (*Id.*) Mr. Vaughn was requesting a "draw on his paycheck," and it seemed like the group was either drunk or high. (*Id.*) Although Mr. Tidwell did not recognize any of the other individuals at the time, Mr. Earley had him try to identify them from a set of photos. (Tr. 219.) Mr. Tidwell was later told by Ronnie Poole that he had identified the other individuals as John Brown and Reginald Early. (Tr. 219-220.)

On cross examination, Mr. Tidwell was taken through the differences between his testimony at trial and the testimony he had given at this evidentiary hearing. At trial, Mr. Tidwell

only testified to seeing Charlie Vaughn and John Brown at his house.  (Tr. 229.)  Furthermore, Mr. Tidwell testified at trial that Charlie Vaughn introduced John Brown to him that night, rather than finding out his identity later.  (Tr. 231.)  At trial, Mr. Tidwell said Mr. Vaughn came back to his house the next morning for more money.  (*Id*.)

### G.    Robert Jeffrey

Robert Jeffrey and Bill Murphy served as Mr. Brown's attorneys for both of his trials in 1992.  (Tr. 253.)  Mr. Jeffrey was newly licensed to practice law and agreed to serve on the case to learn.  (Tr. 263.)  Mr. Jeffrey said he remembered Charlie Vaughn making a confession that incriminated his client.  (Tr. 255.)  In preparation for the case, Mr. Brown's attorneys filed a "motion to compel law enforcement officials to turn over and advise prosecuting attorney of all information acquired during the course of the investigation."  (Tr. 256.)  Mr. Jeffrey said this motion was to ensure there was "no gap in what [they] received from the prosecutor and what actually existed by law enforcement."  (*Id*.)  In addition, Bill Murphy filed a motion for discovery to receive all applicable evidence from the prosecuting attorney.  (Tr. 257.)

Mr. Jeffrey testified that he had never heard of anyone by the name of Ronnie Prescott until being asked to testify in this evidentiary hearing.  (Tr. 257.)  He said he now understood Mr. Prescott to be a "jailhouse snitch, or in more formal terms, an informant working for, in this case, the sheriff and law enforcement."  (Tr. 257-258.)  When handed a copy of the handwritten statement by Ronnie Prescott, Mr. Jeffrey indicated he had never seen it until he received a copy in preparation for the evidentiary hearing.  (Tr. 258.)

Mr. Jeffrey testified about a report that stated Sheriff Donny Ford and Ronnie Pool picked up Ronnie Prescott at a federal penitentiary in Texas and brought him back to Fordyce with the "specific purpose of going and trying to talk to Mr. Vaughn about the alleged murder case."  (Tr.

269.)  According to the statement, Mr. Prescott was equipped with a tape-recorder to use when speaking with Mr. Vaughn.  (*Id*.)  The tape was never played at trial and Mr. Jeffrey believes "the sheriff destroyed the tape."  (*Id.*)  Mr. Jeffrey also said the pending charges against Ronnie Prescott were never prosecuted after he secured the statement from Charlie Vaughn.  (Tr. 271.)  He remembered Mr. Vaughn had to be impeached with his confession at trial because he recanted it beforehand, saying he only confessed because he was afraid of getting the death penalty.  (Tr. 272-273.)

Mr. Jeffrey also recalled hearing Kenny Parsons testify that Mr. Brown came to his residence wearing blood-stained clothes at trial, but was unaware of his mental illness at the time.  (Tr. 259-260.)  He also said he could not remember whether or not Charlie Vaughn's confession was the first time police became aware that Tina Jimerson was involved in the crime.  (Tr. 265.)

At the end of direct and cross examinations, I asked Mr. Jeffrey some questions about the likelihood of Mr. Early committing the murder alone and the following exchange occurred:

> Q.  Did you see the crime scene photos?
> A.  At the time of the trial, yes.
> Q.  In your opinion, is it fair to say that the scene at Ms. Holmes' house was a bloody one?
> A.  It was awful, especially where they found her in the trunk. Being a much younger man, it was hard for me to look at it.
> Q.  Based on your experience, you've been doing these cases a long time, Mr. Early testified that he did that entire act himself, never changed clothes, went straight from there, pretty much, to a funeral with family members and said he -- as far as getting blood on him, there was no issue.  Do you think that's possible?
> A.  It's hard to say what's possible.  Maybe it's possible, but it's probably not probable, given the nature of the crime and the scene.

(Tr. 281-282.)

## H.    Terri Childs

Terri Childs testified that she has lived in Fordyce all of her life.  (Tr. 286.)  She said she has known Mr. Brown for thirty-two years and even wanted to date him as well.  (Tr. 287.)

Additionally, she was good friends with Tina Jimerson and used to stay at her house on occasion. (*Id.*) Ms. Childs spoke about the friendships and relationships she believed John Brown had with other individuals in this case. She knew Mr. Brown and Ms. Jimerson were friends, but did not believe he had any kind of relationship with Mr. Early. (Tr. 288.) She did not think Mr. Brown was ever friends with Lee Parsons or Tara Bryant. (Tr. 289-290.)

Ms. Childs recounted an incident between Mr. Brown and Sonny Tidwell, where Sonny stabbed Mr. Brown under his arm. (Tr. 291.) She remembered it taking a long time to heal and leaving a scar. (Tr. 292.)

On cross examination, Ms. Childs testified that she was interviewed by police at Mill Creek School in 1989, but could not remember specifics of anything she said. (Tr. 294.) She remembered giving another statement to investigators in 2016. (Tr. 296.) Ms. Childs also mentioned she was dating Mr. Brown around the time of the first interview. (Tr. 297.)

### I.    Patsy Lou Harris

Patsy Harris testified she has lived in Fordyce since 1975 and is a commercial driver's license examiner for the Arkansas State Police. (Tr. 299.) In September 1988, she said she worked as a municipal court clerk for the City of Fordyce. (*Id.*) She remembered testifying at one of Mr. Brown's trials in 1992. (Tr. 300.) Ms. Harris was shown an arrest warrant for Robert Sonny Tidwell, which indicated "Sonny was harassing my friend Tina, my boyfriend. John Brown asked him to leave Tina alone and he, Sonny, turned around and stabbed him in the right side of his chest." (Tr. 301-302.) The warrant was signed and dated on July 31, 1988. (Tr. 302.)

When Mr. Brown came to court to testify about that matter several weeks later, she remembered seeing a wound on Mr. Brown's chest. (*Id.*) He had on a brown shirt that was open enough for her to see the wound. (Tr. 303.) She now believes the wound might have come from

the Sonny Tidwell stabbing. (Tr. 304.) Ms. Harris also said she did not want to testify at Mr.

Brown's murder trial because Reginald Early was the nephew of a very close friend of hers. (Tr.

305.)

### J.    Michael Earley

Michael Earley (no relation to Reginald Early) testified he lived in Fordyce in September

1988 and worked as a private investigator. (Tr. 309.) Mr. Earley did not have a favorable opinion

of the Fordyce Police Department, saying "they didn't do the job." (Tr. 311.) He said he got

involved with the investigation of the Myrtle Holmes murder after several of her family members

reached out to him. (*Id*.)

Mr. Earley testified he interviewed Tara Bryant, an informant, but did not remember her

going by the alias "Sam." (Tr. 313-314.) When presented with a report about an interview he

supposedly conducted with Ms. Bryant, he could not remember making the report or the specifics

of that particular interview. (Tr. 315.) He testified Tara Bryant was a neighbor of his and she had

named all of the defendants as being involved in the murder. (Tr. 316-317.) Terry Bryant, Tara's

brother, was very close to Mr. Earley and even stayed at Mr. Earley's house after his dad passed

away. (Tr. 321.)

Mr. Earley said that Tara Bryant saw all of the defendants together at a party, and this was

confirmed by another witness, Darrell Jenkins. (Tr. 323-324.) Mr. Earley also said he saw

Reginald Early and Charlie Vaughn together at Tara Bryant's house at some point before the

murder. (Tr. 325.)

Mr. Earley testified he never showed Ellis Tidwell a photo lineup of anyone that might

have come by his house. (Tr. 326.) He also said he believed Donny Ford did not like him because

he "did [his job] and they didn't do their job." (Tr. 327.) Mr. Earley believed there might have

been some type of "I'll-scratch-your-back-and-you'll-scratch-mine" relationship between Ellis Tidwell and Donny Ford.  (Tr. 328.)

Mr. Earley said he spoke with Charlie Vaughn while he was in jail pending trial.  (Tr. 335.) Mr. Vaughn told him all about the crime, including finding the keys to Ms. Holmes's car and eventually throwing them out into the woods with a knife.  (*Id*.) Mr. Earley stated:

> I talked to Charlie Vaughn. That's the head of it right there. He was in prison or jail at that point. I don't know -- I can't remember if he was at Dallas County jail or at the state penitentiary. But I had gotten back in law enforcement, I can't remember if it was the city or the county at that point, when I talked to him that time. He told me about the keys and everything, which he had already gone through with, and the keys to her car was throwed out in the woods and nobody ever bothered to look. I went out there, and he said there's a knife out there also and I found both of them.

(*Id*.)

## K.    Shannon Manning

Shannon Manning testified that he was a resident of Fordyce in 1988.  (Tr. 339.)  Myrtle Holmes lived three or four blocks away from where he grew up.  (*Id*.)  He calls Reginald Early his cousin because his "mother went with [Early's] uncle."  (*Id*.)  He testified he has no relationship or friendship with John Brown, Charlie Vaughn, or Tina Jimerson.  (Tr. 341-342.)   After Ms. Holmes's murder, Mr. Manning and his family moved to Oakland, California where detectives tracked him down to interview him about his knowledge of the case.  (Tr. 342-343.)  Mr. Manning was "[a]bout fourteen or fifteen" years old at that time.  (Tr. 343.)

Mr. Manning testified that, although he was interviewed "between an hour, maybe hour and a half," he told detectives he "didn't know anything about the murder of Ms. Holmes."  (*Id*.) Yet, from this interview detectives produced a typed report (Tr. 344) that stated, "This interview was signed by Shannon Manning on March 5, 1990, at 12:45 p.m."  (Tr. 350.)  Mr. Manning denies

he provided any information to authorities, but the report contained detailed and incriminating information as follows:

> On September 23, 1988, when I woke up, Reginald Early was at my house. He was fixing to leave. This was 6 a.m. He had on a flower shirt and khaki pants and he took one of my caps. He left a khaki shirt and some faded green pants and a pair of white Nike shoes. I didn't see any blood on him or his clothes. (Tr. 345.)  Reginald Early has told me that it wouldn't bother him to kill someone. He has stolen from me. The morning of September 23rd, 1988, when he was leaving with my cap, he threatened me with a gun. I think it was a .45.  (Tr. 345-346.)  He always hung around with John Brown until John Brown and Reginald Early got in a fight in the Mill Quarters because one of them had said the other had killed Ms. Holmes. John Brown told me it wouldn't bother him to kill someone. (Tr. 346.) Reginald Early ran with two groups. Like I said, he ran with William Knight and Jimmy Rotten, and then his other group was Charlie Vaughn and John Brown. Charlie Vaughn went to the pen with Mini Jenkins from Princeton. (Tr. 347.)  When Reginald and John got in a fight, Mr. Mason, Sonny Tidwell, Jesse James Perry, Albert and Jerry Smith, Don Reason, Pauline Taylor, Tina Jimerson, Tony Summers, Arthur Gallway, and Charlie Vaughn were there. Tina told Don and Reginald to shut up and she was about to cry. Reginald and John had been smoking some weed. Charlie Vaughn was drunk. He told everyone to shut up or he would start shooting. Jesse James made me get into the car and he took me home. (Tr. 347-348.)  Terri Childs and my sister and cousin said that Reginald Early had burned his bloody clothes in our backyard. I never saw a place where a fire had been. I also heard that he took his clothes by Jackie Hubbard's house and washed them and burned them. He has two babies by Jackie Hubbard.  (Tr. 348.)  When Mrs. Holmes was killed, John Brown was living right around the corner and Reginald Early was staying with us. John was staying with Main and Spec Coldwell. They now live in Redwood Manor. (Tr. 349.)  John Brown went to Las Vegas right after everyone started talking about him killing Ms. Holmes. Reginald Early had a lot of money on him about the time of Lee's department arrested him for that gun. John Brown and Reginald Early were very prejudice and I believe would hurt or kill a white person just because they had the opportunity.  (*Id.*)

## III.    ANALYSIS

### A.    Limitations Period

Respondent's first argument is that Mr. Brown's claims are time barred and should be barred from federal habeas review.  (Doc. No. 11 at 4-9.)   Title 28 U.S.C. §§ 2241 (d)(1) and (2) impose a one-year period of limitation on petitions for writ of habeas corpus:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

The one-year limitations period for filing a federal habeas petition began on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such a review." 28 U.S.C. § 2244(d)(1)(A). For Petitioners who were convicted prior to the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), like Mr. Brown, time began to run on April 24, 1996. *Ford v. Bowersox*, 178 F.3d 522, 523 (8th Cir. 1999). Therefore, the clock would have ordinarily stopped for Mr. Brown on April 24, 1997.

Mr. Brown believes he should be given one year from the date when Reginald Early signed his confession - December 21, 2015. That would make the instant Petition timely filed on December 21, 2016. (Doc. No. 1.) But Respondent correctly points out that the newly discovered evidence provision of 28 U.S.C. § 2244(d)(1)(D) begins to run when the factual predicate could

have been discovered through the exercise of due diligence and not when it was actually discovered.

In considering Respondent's argument, it is possible that Mr. Brown may have learned about these events prior to the actual signing of Mr. Early's statement. However, the hearing evidence leads me to conclude the correct triggering date should be December 21, 2015. Namely, hearing testimony revealed that the Innocence Project which represented Mr. Early is wholly independent from the Innocence Project representing Mr. Brown. As Ms. Thompson admitted, "even though [they are] all doing similar missions, [they are] all completely independent organizations." (Tr. 148.) Accordingly, I find the Petition is not barred by the statute of limitations.

### B. Procedural Bar and Actual Innocence

Respondent correctly concludes Mr. Brown's claims are procedurally defaulted. And federal habeas courts may not decide "contentions of federal law which were not resolved on the merits in the state proceeding due to [a petitioner's] failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). But as Petitioner correctly counters, "notwithstanding any procedural default the prisoner or his counsel may have committed in state court, he is nevertheless entitled to federal habeas corpus review of his constitutional claims if he can produce 'new reliable evidence . . . that was not presented at trial,' *Schlup v. Delo*, 513 U.S. [298] at 324 [(1995)], establishing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt,' *Id.*, at 327." (Doc. No. 1 at 13.)

The United States Supreme Court explained in *House v. Bell*, 547 U.S. 518 (2006), that the bar to procedural default is not unqualified. The Court held:

> In an effort to "balance the societal interests in finality, comity, and conservation
> of scarce judicial resources with the individual interest in justice that arises in the

extraordinary case," *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, the Court has recognized a miscarriage-of-justice exception. " '[I]n appropriate cases,' " the Court has said, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " [Citations omitted.]

*House*, 547 U.S. at 536.

To overcome a procedural bar, Mr. Brown must first show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478 at 496 (1986). Respondent argues that Mr. Brown fails at this initial juncture because he brings a "freestanding claim of actual innocence." (Doc. No. 11 at 12.) I disagree.

Mr. Brown has clearly proven a predicate constitutional *Brady v. Maryland*, 373 U.S. 83 (1963),[3] violation whereby law enforcement enticed a confession out of Mr. Vaughn and deliberately failed to disclose this information to the defense. This conduct is deeply troubling and is the kind of conduct that causes courts and the public to lose trust in our law enforcement officers and the judicial process. The fact that Mr. Vaughn was specifically targeted in this effort is also not lost on me. Nevertheless, Mr. Brown's newly discovered evidence – Reginald Early's confession - is simply not reliable.[4]

"To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "To establish the requisite probability, the petitioner must show that it is more likely

---

[3] I recognize Petitioner alleges multiple constitutional violations. I find the *Brady* violation to be the most glaring and significant. Whether I find one or more is not important so long as Petitioner is able to show a constitutional violation exists.

[4] I heard evidence from several other witnesses and Petitioner makes numerous claims about the significance of this testimony. However, I find nothing else really matters if Reginald Early's confession is unreliable.

than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup* at 327.

Mr. Early's version of the events surrounding Myrtle Holmes's murder are inconsistent with the evidence discovered by law enforcement. For instance, Mr. Early insisted that he "took care not to get blood on [him]" (Tr. 57), but also later insisted it was too dark in the house to see if there was any blood after stabbing Ms. Holmes five or six times in the back. (Tr. 80.) Mr. Early testified that it was light enough for Ms. Holmes to see and identify him, but somehow not light enough to be able to differentiate between blood and water. (Tr. 109.) On top of that, Mr. Early testified that he attended his grandmother's funeral and went to the police station the next day wearing the same clothes he had worn during the killing - with no indication of blood on them. (Tr. 127.) Even a cursory look through the crime scene photos would cast great doubt on Mr. Early's self-proclaimed ability to put the body of Myrtle Holmes into the trunk of her car without getting blood on himself. And as previously recited, Robert Jeffrey, Mr. Brown's original trial counsel, testified that Mr. Early's assertion here was "probably not probable, given the nature of the crime and the scene." (Tr. 282.) Common sense leads me to wholeheartedly agree.

I also take issue with Mr. Early's characterization of his conviction. Several times over the course of the evidentiary hearing, Mr. Early indicated that he felt "just as wronged" as his co-defendants simply because he was convicted as an accomplice to the murder, and not the sole murderer. (Tr. 117.) He said he was coming forward with this information because he was only concerned about himself. (Tr. 123.) When pressed, Mr. Early gave an interesting response:

> [COURT]: Do you think somehow down the road you're going to win on legal technicality that says you should be released, too?
>
> [EARLY]: No, that ain't – that ain't – that ain't even in the back of my agenda unless – until now you just said some shit. It never even rang in my head like that.

(Tr. 124.)

I also find Mr. Early's testimony about long wanting to tell the truth to his counsel is, frankly, a lie. (Tr. 120-121.) Mr. Early wants me to believe he tried to tell his lawyer during several conference calls but "wasn't crystal clear about the attorney-client privilege, so [he] chose not to say nothing then." (Tr. 120.) And then, after he knew the motion for new testing was being filed, he diligently wrote his lawyer a letter and then called "every day on Wednesday, [at] two o'clock." (Tr. 121.) Then, according to Mr. Early:

> Well, I got the petition. They sent it to me in the mail. So then I kept calling and kept calling and kept calling. So finally I get her on the phone. So she get on the phone, and I just – I'm like, this ain't something that's fixing to come out. And I said, 'Ma'am, I been trying to get you on this phone by yourself for a long time.' And she said, 'Well, you got me now.' And I sit there and I think and contemplate. I said, boy, when you do this, you know, you can't unring this bell if you do it. So I just -- I told her. I said, 'Ma'am, everything I told you is the truth, but -- I did commit the crime, but I committed it by myself.'

(Tr. 121.)

Mr. Early's testimony on this point is starkly different than what the evidence reveals. Mr. Early had sold his innocence to the hard working people of the Innocence Project who believed that modern DNA testing would vindicate him from this crime. If Mr. Early was innocent, new testing would result in someone other than Reginald Early surfacing as the perpetrator of this horrible crime; perhaps even a relative of Mr. Early given the previous DNA test results. But realizing the character of some of the people they represent, Ms. Thompson testified, "So before we file anything, we sit down with them one more time and we say, 'This is it, we're going to get our results and the results are going to be what the results are going to be. So do you still want us to file the motion?" (Tr. 145.) Mr. Early told her he still wanted her to file the motion, so she did on October 21, 2015. (Tr. 146.) But on October 27, 2015, Ms. Thompson received that fateful call from Mr. Early causing Ms. Thompson to immediately withdraw the motion. (Tr. 146-147.)

These facts lead me to conclude that it was only when Mr. Early received a copy of the motion in the mail, did he truly realize his fate was sealed.  Knowing full well the DNA test would prove his guilt, Mr. Early turned to what he knows best – "go create mischief."  (Tr. 111.)   And mischief Mr. Early has indeed created on the backs of the not-for-profit Innocence Project and the State of Arkansas.

Petitioner's new evidence, while not available at trial through the exercise of due diligence, does not even begin to reach a level of reliability I would need to justify granting relief for Mr. Brown.  Mr. Brown's Petition survives only on the credibility of Mr. Early.  And Mr. Early is wholly incredible.  Therefore, it is my recommendation that Mr. Brown's Petition be dismissed as procedurally defaulted.

### C.    Motion for DNA Testing

Petitioner's Motion to Authorize Discovery, Compel a Search for Evidence, and Order DNA Testing should also be denied.  (Doc. No. 33.)  After careful consideration, I conclude that such a request will do nothing to further Mr. Brown's position.  The DNA test already conducted in this case already conclusively excluded John Brown as a potential donor from the two vaginal swabs taken from the victim.  (Pet. Ex. 15.)  And while not as conclusive as Mr. Brown's results, the test did identify Reginald Early as a *potential* donor.  (*Id.*)

The only possible result of further testing would be to confirm Mr. Early as a complete DNA match to the sample taken, a fact Mr. Early already admits to be true.  Even if I were to take him at his word on this point, it still cannot clear Mr. Brown of any participation in this crime.  It is simply not possible for DNA testing to conclude that Petitioner was not a participant in the murder.

Petitioner argues – somewhat persuasively – that testing other physical evidence could corroborate Mr. Early's testimony.  However, even if new testing resulted in no matches to Mr. Brown, it could only *conclusively* prove one thing:  Mr. Brown's DNA, for whatever reason, was not collected.  And as so aptly put by the Superior Court of Pennsylvania, "[i]n DNA as in other areas, an absence of evidence is not evidence of absence."  *Com. v. Heilman*, 2005 PA Super 867 A.2d 542, 547 (2005).    I agree with Respondent that additional testing would not be appropriate in the context of this habeas proceeding and therefore Petitioner's Motion for DNA Testing should be denied.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  In cases where the Petitioner's claims are procedurally barred, a district court must consider the following factors when determining whether it should issue  a certificate of appealability:  "(1) if the claim is clearly procedurally defaulted, the certificate should not be issued; (2) even if the procedural default is not clear, if there is no merit to the substantive constitutional claims, the certificate should not be issued; but, (3) if the procedural default is not clear and the substantive constitutional claims are debatable among jurists of reason, the certificate should be granted."  *Khaimov v. Crist*, 297 F.3d 783, 786 (8th Cir. 2002) (*citing Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000)); *see also Langley v. Norris*, 465 F.3d 861, 863 (8th Cir. 2006).

In this case, the first two criteria apply to all of Petitioner's claims.  They are procedurally defaulted and without merit.  Therefore, no certificate of appealability should be issued.

## V.    CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1.    The Petition for Writ of Habeas Corpus (Doc. No. 1) be DISMISSED and the requested relief be DENIED.

2.    The Motion for Order to Authorize Discovery, Compel a Search for Evidence, and Order DNA Testing (Doc. No. 33) be DENIED.

3.    A certificate of appealability should not be issued.

DATED this 8th day of February, 2018.

_____
JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE