**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**JOHN BROWN**                                                                    **PETITIONER**

**VS.**                                 **5:16-CV-00381-BRW-JJV**

**WENDY KELLEY, Director,**
**Arkansas Department of Correction**                                    **RESPONDENT**

<u>**ORDER**</u>

I have received Proposed Findings and Recommendations ("Recommendation") (Doc.

No. 45) from United States Magistrate Judge Joe J. Volpe.  After careful consideration of the

Recommendation and the parties' objections, and after a *de novo* review of the record, which

includes the record incorporated from *Jimerson v. Kelley*,[1] I adopt much of Judge Volpe's fact-

finding and analysis.[2]  However, I decline to adopt the Recommendation.

For the reasons set out below, Petitioner John Brown's petition for writ of habeas corpus

is GRANTED.[3]  Mr. Brown's Motion to Authorize Discovery, Compel a Search for Evidence,

and Order DNA Testing (Doc. No. 33) is DENIED as MOOT.  Mr. Brown's murder and

aggravated robbery convictions are VACATED, subject to retrial.[4]  Respondent has thirty days

from the entry of this order to release Mr. Brown or bring new criminal proceedings against him.

---

[1] 5:15CV00208-BSM-JTK (E.D. Ark.), at Doc. No. 61.

[2] I also agree with much of Judge Kearney's fact-finding and analysis provided in his
Recommendation. *Jimerson*, 5:15CV00208-BSM-JTK (E.D. Ark.), at Doc. No. 61.

[3] Doc. No. 1.

[4] Doc. No. 11-2; *State v. Brown*, Case No. CR90-17 (Circuit Court of Dallas County
Arkansas, filed Aug. 19, 1992).

# I. BACKGROUND

The night of September 21 or early September 22, 1988, Reginald Early brutally raped, robbed, and murdered Myrtle Holmes, an elderly woman living in Fordyce, Arkansas. In August 1992, a Dallas County jury found Mr. Early, Mr. Brown, and Tina Jimerson[5] guilty of murder and aggravated robbery of Ms. Holmes. The convictions followed an April 1992 "hung jury" mistrial on rape and capital murder charges.

A fourth co-defendant, Charlie Vaughn, pled guilty before the first trial, after an enticed confession to an undisclosed government informant.[6] Mr. Vaughn recanted, but his confession was critical trial evidence leading to the convictions. The Arkansas Supreme Court noted how critical the confession was when it found sufficient evidence to uphold Mr. Brown's convictions:

> Here, there is substantial evidence of both crimes. Charlie Vaughn pleaded guilty to the murder, and at the time of his plea, testified that the three appellants "wanted to do a robbery." He said appellant Jimerson drove the foursome to the victim's home where appellant Brown entered through a window and let appellants Early and Vaughn inside. Jimerson remained in the car. Vaughn further testified that they looked for and found money which they took. He stated that appellant Brown beat the victim, an elderly woman, with pots and pans and then raped her. He said he and appellant Brown then raped her, and appellant Brown slit her throat. Vaughn testified that he and Brown then took the body and placed it in the trunk of the victim's car. In addition, Darrell Jenkins testified that appellant Early told him that he had killed the victim by hitting her with pots and pans and stabbing her. Michael Early's [sic] testimony placed appellant Early near the scene close to the time the crime was committed. The testimony of three other witnesses, Taura Bryant, Lee Parsons, and Kenny Parsons, placed the three appellants together on the night of the crime, with appellant Jimerson driving the group. Without question, the foregoing constitutes substantial evidence of the crimes for which appellants were convicted.[7]

Without Mr. Vaughn's confession, it is doubtful that there was sufficient evidence to support Mr. Brown's convictions. Judge Volpe noted that it was troubling that law enforcement

---

[5]*Jimerson v. Kelley*, 5:15CV00208-BSM-JTK (E.D. Ark.), at Doc. No. 61.

[6]Doc. No. 45, p. 23.

[7]*Brown v. State*, 315 Ark. 466, 471 (1994).

targeted Mr. Vaughn, who had significant mental deficiencies.[8] Mr. Vaughn's former employer (and important state witness), Ellis Tidwell, thought Mr. Vaughn had the IQ of a seven-year-old.[9]

All four co-defendants received life sentences. After years of maintaining his innocence, Mr. Early has now sworn in affidavits, and open court, that he committed this horrific crime alone. Deoxyribonucleic acid ("DNA") evidence, presented during the first trial but not at the second trial, confirmed Mr. Early raped Ms. Holmes. No physical evidence connected any of the other defendants to the crime. Newly discovered evidence has also called into question the fundamental fairness of Mr. Brown's trial.

The details of the brutal rape, robbery, and murder of Ms. Holmes and the subsequent investigation are well-documented.[10] I adopt the factual findings and summaries of Judge Volpe and Judge Kearney, made after their respective evidentiary hearings in these related cases.[11] I adopt Judge Volpe's summary of the procedural history of Mr. Brown's case,[12] and incorporate Judge Kearney's summary of the evidence in the trial leading to Mr. Brown's conviction.[13]

---

[8]Doc. No. 45, p. 23; see also *Jimerson*, 5:15CV00208-BSM-JTK, at Doc. No. 61, pp. 25-26 (Mr. Vaughn quit school in the tenth grade and had been in special education classes. At the time of the evidentiary hearing it was apparent Mr. Vaughn was still illiterate).

[9]Doc. No. 1, p. 445.

[10]See Doc. No. 45; *Jimerson*, 5:15CV00208-BSM-JTK, at Doc. No. 61; *Brown v. State*, 315 Ark. 466 (1994).

[11]Doc. No. 45, pp. 5-20; *Jimerson*, 5:15CV00208-BSM-JTK, at Doc. No. 61, pp. 4-8.

[12]Doc. No. 45, pp. 2-4.

[13]*Jimerson*, 5:15CV00208-BSM-JTK, at Doc. No. 61, pp. 9-16.

## II.    INTRODUCTION

On December 21, 2016, Mr. Brown filed the instant Petition for Writ of Habeas Corpus alleging: (1) actual innocence; (2) a violation of due process rights under *Brady v. Maryland*;[14] (3) a violation of due process rights under *Arizona v. Youngblood*;[15] (4) a violation of due process because of the failure to disclose additional interviews and incentives provided to witnesses Ellis Tidwell and Kenny Parsons in exchange for testifying; (5) a violation of due process when the prosecutor failed to correct known, false evidence; and (6) multiple instances of ineffective assistance of counsel.[16]  Respondent argues the petition is time-barred, the claims are procedurally defaulted, and the claims fail on their merits.[17]

The record is fairly clear.  Mr. Brown is entitled to relief if he timely filed his claims and can overcome procedural default.  By far the most important evidence – and only direct evidence – against Mr. Brown was the result of a "glaring" *Brady* violation; the enticed confession of a mentally deficient co-defendant, to an undisclosed government informant or agent.[18] Corroborating testimony also presented *Brady* and *Giglio*[19] issues.  The State violated *Youngblood* by destroying evidence directly related to the confession.  Finally, it appears that the State violated *Napue* by knowingly permitting a government witness to give false testimony.[20]

---

[14]373 U.S. 83 (1963).

[15]488 U.S. 51 (1988).

[16]Doc. No. 1.

[17]Doc. No. 11.

[18]Judge Volpe noted the "glaring" violations.  I agree.  Doc. No. 45, p. 23, fn. 3.

[19]*Giglio v. United States*, 405 U.S. 150, 153-55 (1972) (government must disclose matters that affect the credibility of prosecution witnesses).

[20]*Napue v. Illinois*, 360 U.S. 264 (1959).

These multiple constitutional violations and irregularities seriously undermine any confidence in the outcome of the trial.[21] Even without the *Brady* violations, there is a reasonable probability that the result for Mr. Brown would have been different.

## III. DISCUSSION

This Court may entertain Mr. Brown's petition only on the ground that he is in state custody in violation of the Constitution or federal law.[22] With few exceptions, a petitioner must exhaust remedies available in state courts, and file a timely petition, before a court can consider granting relief.[23]

### A. Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 established a one-year limitations period for a state prisoner to file a federal habeas corpus petition under 28 U.S.C. § 2254.[24] Mr. Brown's conviction is 26 years old.

In the typical habeas proceeding, the limitations period begins to run when the judgment becomes final by the conclusion of direct review.[25] Direct review concluded in 1994.[26] Mr. Brown did not file any post-conviction proceedings that would statutorily toll the limitations period.[27] The one-year limitations period commenced in 1996, giving Mr. Brown until 1997 to

---

[21]*United States v. Jeanpierre*, 636 F.3d 416, 423 (8th Cir. 2011) (citations omitted) (discussing when undisclosed *Brady/Giglio* information is material).

[22]28 U.S.C. § 2254(a).

[23]28 U.S.C. § 2244(d); 28 U.S.C. § 2254(b)-(c).

[24]28 U.S.C. § 2244(d)(1).

[25]28 U.S.C. § 2244(d)(1)(A).

[26]*Brown v. State*, 315 Ark. 466, 471 (1994).

[27]28 U.S.C. § 2244(d)(2).

bring any claim for which the factual predicate was discoverable in a timely petition.  He filed the instant petition on December 21, 2016.[28]

## 1.  Ineffective Assistance Claims

Mr. Brown's ineffective assistance of counsel claims are time-barred, subject only to equitable tolling.[29]  Failure to present exculpatory DNA evidence during the second trial was a strategic mistake.[30]  Failing to investigate witnesses more thoroughly was well below any reasonable standard.  Failing to timely file motions or to preserve any points for appeal was deficient.[31]  In 1998, too late for Mr. Brown, the Arkansas Supreme Court permanently barred his lead counsel from practicing law in Arkansas.[32]  This came after a guilty plea to a federal suborning perjury charge.[33]

Although these facts are troubling, they were, for the most part, discoverable by Mr. Brown years ago.  He did not present these claims in a timely fashion.

## 2.  Other Claims

However, using due diligence, neither Mr. Brown nor counsel could have discovered the factual predicates for the majority of his *Brady*, *Giglio*, *Youngblood*, *Napue*, and actual-innocence claims.

Under 28 U.S.C. § 2244(d)(1)(D), the limitations period begins the date on which the factual predicate of the claims could have been discovered through the exercise of due diligence.

---

[28]Doc. No. 1.

[29]*Holland v. Florida*, 130 S. Ct. 2549 (2010).

[30]Doc. No. 38-1, p. 36.

[31]*Brown*, 315 Ark. at 469.

[32]*In re Murphy*, 982 S.W.2d 199 (Ark. 1998).

[33]Doc. No. 1, p. 456.

This requires "claim-by-claim consideration," meaning the provision only applies to the claims based on the newly discovered facts.[34]

Mr. Brown possibly could have discovered the factual predicate for the majority of his claims when Ms. Jimerson filed her initial Petition for Habeas Corpus on June 30, 2015.[35] In reality though, that would have required Mr. Brown to continually review federal district court filings over the last 26 years – and 28 U.S.C. § 2244(d)(l)(D) requires only reasonable diligence, not "maximum feasible diligence."[36] "[D]iligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize that he has an interest in challenging" a conviction.[37]

Judge Volpe noted that, with due diligence, Mr. Brown could have discovered the factual predicate of his actual innocence claim on December 21, 2015, at the earliest, when Mr. Early signed his confession.[38] Though Mr. Brown's petition is timely under Judge Volpe's conclusion, I find that even this date required more than reasonable diligence. Mr. Brown was indigent, incarcerated, and had no counsel at that time. For the reasons set out below, I believe June 2016 is the earliest possible date, based on reasonable diligence.

---

[34]*DeCoteau v. Schweitzer*, 774 F.3d 1190, 1192 (8th Cir. 2014) (the statute of limitations in 28 U.S.C. § 2244(d)(1) applies to each claim within an application); *Jimerson*, 5:15CV00208-BSM-JTK, at Doc. No. 61, p. 32.

[35]Doc. No. 1, p. 36. This Case differs significantly from co-defendant Ms. Jimerson's habeas proceeding. There, counsel from a Legal Clinic had been representing Ms. Jimerson since 2013. An investigator working for counsel learned about Ronnie Prescott (the undisclosed-government informant or agent) and the destruction of evidence on January 7, 2014. Ms. Jimerson did not file her habeas petition until June 20, 2015.

[36]*Starns v. Andrews*, 524 F.3d 612, 618 (5th Cir. 2008) (quoting *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004)).

[37]*Johnson v. United States*, 544 U.S. 295, 308 (2005).

[38]Doc. No. 45, pp. 21-22.

Midwest Innocence Project – wholly independent of the Innocence Project representing Mr. Early and the Legal Clinic representing Ms. Jimerson – agreed to represent Mr. Brown in June 2016 in the evidentiary hearing in Ms. Jimerson's habeas case.[39]  This was the first reasonable opportunity for Mr. Brown to learn of the investigations already underway on behalf of Mr. Early and Ms. Jimerson, Mr. Early's confession, and the claims submitted in Ms. Jimerson's petition.  On June 15, 2016, during Ms. Jimerson's evidentiary hearing, Mr. Brown learned of Ronnie Prescott's role as an informant or agent.[40]  Mr. Brown's trial counsel had never even heard of Mr. Prescott until Mr. Brown's evidentiary hearing on October 4, 2017.[41]  By August 2016, Mr. Brown had discovered additional claims related to the testimony of Lee Parsons, Kenny Parsons, and Ellis Tidwell.[42]

Exercising due diligence, the factual predicates for Mr. Brown's *Brady*, *Giglio*, *Youngblood*, *Napue*, and actual innocence claims were discoverable on December 21, 2015, at the earliest, but more reasonably by June 2016.[43]  Accordingly, Mr. Brown timely filed these claims in his December 21, 2016 petition.

---

[39]Doc. No. 45, pp. 21-22; Doc. No. 1, pp. 25, 40.

[40]*Jimerson*, 5:15CV00208-BSM-JTK at Doc. Nos. 50 and 51.

[41]Doc. No. 38-1, pp. 10-11.

[42]Doc. No. 1, pp. 441-446.

[43]The State can have little complaint with this finding as the inability to discover these facts sooner was in large part due to the state's unconstitutional conduct.

**B.     Procedural Default**

A petitioner challenging state custody must exhaust available state court remedies before seeking federal habeas review.[44]  To exhaust state remedies, a petitioner uses the state's established review procedures to present the substance of each claim to the appropriate state court, thereby giving it an opportunity to pass upon and correct any constitutional error.[45] "Claims in a federal habeas petition not presented in the state court proceedings and for which there is no remaining state court remedy are defaulted."[46]  Default is excused only if a petitioner shows cause and prejudice for the default or a miscarriage of justice.[47]  A showing of "actual innocence" satisfies the miscarriage of justice exception to procedural default.[48]

Mr. Brown's trial counsel did not preserve any grounds for review for the state appellate courts.  Mr. Brown failed to present any of his claims to state courts through post-conviction petitions, likely because he had no way to discover the factual predicate of his claims in time. Respondent notes that, at the time of filing, Mr. Brown had no unexhausted, non-futile state remedies available to him.[49]  Generally, Mr. Brown defaulted any claim he could bring in a federal habeas petition.  But, based on this record, I find merit in Mr. Brown's claims.

---

[44]*Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).

[45]*Armstrong v. Iowa,* 418 F.3d 924, 925 (8th Cir. 2005); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); 28 U.S.C. § 2254(b) and (c).

[46]*Interiano v. Dormire*, 471 F.3d 854, 856 (8th Cir. 2006).

[47]*Id.*

[48]*McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013).

[49]Doc. No. 11, p. 3.

Mr. Brown meets the actual innocence gateway exception to procedural default recognized in *Schlup*,[50] *House*,[51] and *McQuiggin*.[52]  Separately, Mr. Brown excused his default by showing cause and prejudice.  I also find that under the circumstances here, the State failed to provide a corrective process, or, at least, the process was ineffective to protect Mr. Brown's rights.  Accordingly, the State cannot rely on procedural default to defeat Mr. Brown's claims.

### 1. Actual Innocence

Judge Volpe found Mr. Brown failed to establish actual innocence because Mr. Early's confession was not reliable.[53]  Comparing this case to the claims of actual innocence presented in *Schlup*,[54] *House*,[55] and *McQuiggin*,[56] I find Mr. Brown proved a colorable-gateway claim of

---

[50]*Schlup v. Delo*, 513 U.S. 298 (1995).

[51]*House v. Bell*, 547 U.S. 518 (2006).

[52]*McQuiggin v. Perkins*, 569 U.S. 383 (2013); Mr. Brown alleged actual innocence as both gateway and freestanding claims.

[53]Doc. No. 45, pp. 23-26.

[54]In *Schlup v. Delo*, 513 U.S. 298 (1995), Mr. Schlup was sentenced to death for participating in the murder of a fellow prisoner.  No physical evidence supported the conviction. The only evidence of guilt came from two corrections officers who testified that three white inmates (including Mr. Schlup) attacked a black inmate. Mr. Schlup's defense was mistaken identity. His petition alleging actual innocence was supported by three affidavits from inmates attesting to Schlup's innocence.  Two of the affidavits identified the third assailant, who arrived at lunch with one of the other assailants. Videotape evidence showed that Mr. Schlup was the first inmate to arrive at the dining room around the time of the murder, before guards responded to a distress call.  After the guards responded, one of the assailants ran into the dining room, dripping blood.  He was followed by the inmate who two affidavits identified as the third assailant.  A lieutenant at the prison also provided an affidavit that called into question Mr. Schlup's participation in the attack.

[55]*House v. Bell*, 547 U.S. 518 (2006) involved a conviction for murder and a possible sexual assault. DNA testing showed that semen evidence presented at trial belonged to the victim's husband, not Mr. House.  Mr. House's jeans, however had the victim's blood on them. Testing after the trial showed that the bloodstains on Mr. House's jeans likely came from blood samples taken during the victim's autopsy. The blood samples were placed inside a cardboard box, with the jeans and other evidence, and transported during a 10–hour car ride.  The jeans were in a paper bag in the box. The paper bag was apparently discarded, but the plastic bag

actual innocence.[57]  I decline, as has the Supreme Court, to recognize a freestanding habeas claim of actual innocence.[58]

Actual innocence may serve as a gateway to overcome procedural default or the expiration of the limitations period.[59]  A threshold showing of actual innocence requires new, credible evidence sufficient so that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt.[60]  A petitioner must support the allegations with "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."[61]

---

where the jeans were ultimately place had a five-inch long, two-inch wide streak of blood down the front of the bag.  In addition to the DNA evidence, Mr. House also had sworn testimony from two different witnesses that the victim's husband had confessed to the murder; two more witnesses described the husband's suspicious behavior around the time of the crime; and additional witnesses described a history of physical abuse.

[56]In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), Mr. Perkins was convicted of murdering his friend while an acquaintance looked on.  The acquaintance provided key eyewitness testimony.  Two additional witnesses testified Mr. Perkins confessed to them. Mr. Perkins presented affidavits from three individuals placing responsibility for the murder on the acquaintance.  Mr. Perkins waited years before presenting the affidavits in a habeas proceeding.  Ultimately, the three affidavits were insufficient to prove actual innocence.

[57]See *Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012) (actual innocence established when credible and compelling testimony calls into serious doubt the central evidence linking petitioner to the crime).

[58]*McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-405 (1993)).

[59]*Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell,* 547 U.S. 518 (2006); *McQuiggin*, 569 U.S. 383.

[60]*McQuiggin*, 569 U.S. at 386.

[61]*Schlup*, 513 U.S. at 324.

The actual-innocence standard is demanding.[62] "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error.'"[63] The standard does not require, however, "absolute certainty about the petitioner's guilt or innocence."[64]

Mr. Brown's showing of actual innocence rests primarily with the credibility of Mr. Early's confession and its potential impact on a reasonable juror. The weakness of the case against Mr. Brown and the prejudicial constitutional violations at trial are also relevant.

Mr. Brown's first trial resulted in a hung jury split six-to-six.[65] Ms. Holmes was brutally raped, stabbed, beaten, and murdered. The State's theory was that Mr. Brown, personally, raped and repeatedly stabbed Ms. Holmes, with Mr. Vaughn and Mr. Early participating. Police found hair in both Ms. Holmes's hands and genetic material under her fingernails.[66] Evidence also included a satin pillow case, blue sheet, yellow throw rug, a fitted sheet, a top sheet, a blue pillowcase, white apparel, a blue house coat, green pajama top, white top, a shirt, a telephone cord, a pot, a saucepan, a knife handle, and two knives.[67] Yet none of the physical evidence connected Mr. Brown to the crime. Furthermore, DNA evidence presented at the first trial excluded Mr. Brown as the donor; instead, the DNA came from Mr. Early, who now swears he raped and murdered Ms. Holmes alone.

---

[62]*McQuiggin*, 569 U.S. at 401.

[63]*Id.* (quoting *Schlup*, 513 U.S. at 316).

[64]*House*, 547 U.S. at 538.

[65]Doc. No. 44, p. 1.

[66]Doc. No. 33-1, pp. 3, 5.

[67]Doc. No. 33-1, p. 6, 8.

The exculpatory DNA in this case is not new scientific evidence. It was available, but not presented, at Mr. Brown's second trial. However, Mr. Early's confession is new, exculpatory evidence. Judge Volpe found the confession not credible, but courts have considered confession evidence among the strongest possible evidence for more than one hundred years.[68] Mr. Early clearly committed the murder. The only question is if he committed the murder alone.

The only direct evidence against Mr. Brown was Mr. Vaughn's confession, the use of which in Mr. Brown's trial was the result of a glaring *Brady* violation. Comparing the inconsistencies in Mr. Vaughn's and Mr. Early's dueling confessions, it appears Mr. Early provided substantially more detail. Additionally, he did not require prompting and redirection like Mr. Vaughn. Mr. Early also more accurately described the crime scene.

The morning after the murder, police picked up Mr. Early and questioned him about his involvement. Before trial, Mr. Early confessed to Darrell Jenkins that Mr. Early had killed Ms. Holmes by hitting her with pots and pans and stabbing her. Investigator Michael Earley's testimony placed Mr. Early near the scene close to the time the crime was committed.[69]

Circumstantial evidence from four witnesses, Taura Bryant, Lee Parsons, Kenny Parsons, and Ellis Tidwell, placed all the defendants together on the night of the crime. But, new evidence from three of these eyewitnesses calls into question their trial testimony.

Mr. Tidwell testified at trial that Mr. Brown appeared with confessed-murderer Mr. Vaughn at Mr. Tidwell's home the night of the murder, 200 yards from Ms. Holmes's house,

---

[68]See *Harrold v. Territory of Oklahoma*, 169 F. 47 (8th Cir. 1909) (a free and voluntary confession deserves the highest credit because it flows from the strongest sense of guilt).

[69]*Brown v. State*, 315 Ark. 466, 471 (1994).

"wild-eyed" and looking for money.[70]  Mr. Tidwell knew it was Mr. Brown because Mr. Vaughn introduced them.  Mr. Tidwell now claims he only identified Mr. Brown after having been shown a previously undisclosed photo lineup.

Ms. Bryant is deceased, but evidence of her undisclosed familial relationship with Investigator Earley somewhat undermines the credibility of her testimony.  Two witnesses, Stephanie Rogers and Mary Chambers, challenged Ms. Bryant's testimony during a closed court session.  They both would have testified that they overheard Ms. Bryant say to Sheriff Donny Ford before her trial testimony, "What am I supposed to say? I don't know what I'm supposed to say, I don't even know why I'm here."[71]  The jury did not hear their testimony.

Lee Parsons and Kenny Parsons now both call into question their own testimony.  Kenny Parsons was a jail trustee, in a program run by his father, when he offered incriminating evidence years after the murder.  It appears the State never disclosed his severe mental illness or drug abuse.  Both the Parsons claim they don't even remember testifying due to drug use.

What additional evidence could a petitioner in Mr. Brown's situation provide to show actual innocence?  The only direct evidence against him was the enticed, recanted confession of a mentally deficient co-defendant that was the result of a glaring *Brady* violation.  Police collected numerous items of physical evidence, yet none of it connected Mr. Brown to the scene of a brutal rape and murder.  DNA evidence excluded Mr. Brown as a donor.  The DNA did, however, match co-defendant Mr. Early, who has now provided a sworn, detailed confession that exonerates Mr. Brown.  The circumstantial evidence against Mr. Brown was unreliable at best – and it is likely false and the result of several constitutional violations.

---

[70]Doc. No. 11-5, pp. 149-150.

[71]Doc. No. 11-6, pp. 338-349.

Mr. Brown's actual innocence claim is compelling when the evidence of innocence is compared to the evidence of guilt. Had Mr. Early's confession been presented during the second trial, absent the *Brady* violations, no reasonable juror could have convicted Mr. Brown. I could possibly have confidence in the outcome of Mr. Brown's trial, but only if the trial was free of non-harmless constitutional error. Instead, Mr. Brown's trial was shot through with several material constitutional violations.

### 2. Cause and Prejudice

A petitioner's default is excused if he can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law."[72] Independent of actual innocence, Mr. Brown has shown cause and prejudice sufficient to excuse his default.

Cause is established when "some objective factor external to the defense" impedes efforts to comply with state procedural rules.[73] The Supreme Court has found cause with facts almost identical to Mr. Brown's:

> In summary, petitioner has established cause for failing to raise a *Brady* claim prior to federal habeas because (a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the Commonwealth confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received "everything known to the government."[74]

That case concerned a *Brady* violation, and its reasoning applies equally to Mr. Brown's *Giglio*, *Youngblood*,[75] and *Napue* claims. Mr. Brown firmly established cause for his procedural

---

[72]*Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

[73]*Murray v. Carrier*, 477 U.S. 478, 488 (1986).

[74]*Strickler v. Greene*, 527 U.S. 263, 289 (1999).

[75]*Youngblood* requires an additional showing of bad faith. *Youngblood*, 488 U.S. at 58.

default when considering the withheld evidence; reliance on an open-file policy; the State's knowledge that the reliance prevented Mr. Brown from discovering critical impeachment evidence; the destruction of evidence; and the potentially false, uncorrected testimony presented at trial.

To show prejudice, Mr. Brown must essentially prove the merits of his claims. Proof of suppressed evidence is sufficient to overcome procedural default only if it is "material."[76] "Evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."[77] Accordingly, I will address the prejudice prong within the merits of Mr. Brown's claims.

### C.      Merits of Mr. Brown's Claims

Mr. Brown raised a number of claims. Again, his ineffective assistance of counsel claims are time-barred. His gateway actual innocence showing still requires proof of an underlying constitutional violation. I find several, all stemming from the *Brady* violations.

#### 1. *Brady v. Maryland*

A state's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[78] Evidence is material when there is "any reasonable

---

[76]*Banks v. Dretke*, 540 U.S. 668, 698 (2004) (citing *Strickler*, 527 U.S. at 282 and *Kyles v. Whitley*, 514 U.S. 419 (1995)).

[77]*Turner v. United States*, 137 S. Ct. 1885, 1893 (2017).

[78]*Brady*, 373 U.S. at 87.

likelihood" it could have "affected the judgment of the jury."[79]  A new trial is required when a

petitioner proves a *Brady* violation.[80]

Judge Volpe found one of the *Brady* violations in this case to be glaring:

> Mr. Brown has clearly proven a predicate constitutional *Brady v. Maryland*, 373 U.S. 83 (1963), violation whereby law enforcement enticed a confession out of Mr. Vaughn and deliberately failed to disclose this information to the defense. This conduct is deeply troubling and is the kind of conduct that causes courts and the public to lose trust in our law enforcement officers and the judicial process. The fact that Mr. Vaughn was specifically targeted in this effort is also not lost on me.[81]

Judge Kearney found the State's excuses for the conduct unpersuasive:

> Respondent's argument that the factual predicate of Petitioner's claims was discoverable before trial, had trial counsel taken advantage of the prosecutor's open-file policy and reviewed the case files, is unpersuasive. There is no question that the prosecutor's responses to trial counsel's discovery requests in this case were misleading at best, and arguably untruthful. The police did use an informant; tape recordings with co-defendant Vaughn talking to the informant did exist; and the informant did have pending charges against him dropped as a result of his help with the case. It was not unreasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination. The problem here is that the prosecutor's file, for whatever reason, did not contain the tape recordings or any information that indicated they had used an informant. So whether trial counsel reviewed the file or not, nothing was there. Because it is presumed that prosecutors will fully "discharge their official duties," it was not unreasonable for trial counsel to rely on the prosecutor's open-file policy as fulfilling the prosecution's duty to disclose exculpatory evidence. Whether the nondisclosure was inadvertent or deliberate, under Brady, it has the same impact on the fairness of the proceedings. See *id.* Likewise, it was not counsel's job to review the prosecutor's file to determine if there had, in fact, been a misrepresentation as to these matters.[82]

---

[79]*Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio*, 405 U.S. at 154 and *Napue*, 360 U.S. at 271).

[80]*Id.*

[81]Doc. No. 45, p. 23.

[82]*Jimerson*, 5:15CV208-BSM-JTK, at Doc. No. 61, pp. 36-37 (citations omitted).

Again, the only direct evidence against Mr. Brown was Mr. Vaughn's confession. If the jury believed Mr. Vaughn initially gave a truthful, voluntary confession, then the jury had little choice but to convict Mr. Brown. Conversely, if the jury had reason to doubt Mr. Vaughn's confession, the only remaining evidence against Mr. Brown was circumstantial – weak circumstantial evidence placing him only in the company of his co-defendants.

The entire record is relevant when considering the materiality of a *Brady* violation.[83] That makes the lack of reliable evidence showing Mr. Brown's guilt important. Failure to disclose exculpatory or impeachment evidence would not undermine confidence in the verdict if there was other overwhelming evidence against Mr. Brown.[84] Here, the "State's trial evidence resembles a house of cards," built on a highly questionable confession, supported by jail-house trustees and testimony from witnesses who were so drugged-out, they cannot even remember testifying in a murder trial.[85]

The State's failure to disclose the use of an informant to entice the confession is sufficient, alone, to undermine the confidence in the verdict. But this was not its only failure.

The State also failed to disclose, and actually destroyed, a recording of the informant eliciting the confession. Independently, this *Brady/Youngblood* violation also undermines confidence the verdict.

The State also offered informant incentives that it never disclosed to the defense. Mr. Prescott had major felonies dismissed after his "assistance" in procuring Mr. Vaughn's confession. Mr. Tidwell was two years into a twenty-year sentence when Sheriff Donny Ford

---

[83]*Turner v. United States*, 137 S. Ct. 1885, 1893 (2017).

[84]*United States v. Jeanpierre*, 636 F.3d 416, 423-24 (8th Cir. 2011).

[85]*Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (considering the weakness of the case when evaluating *Brady* violations).

procured his release to act as a jail trustee. Shortly after, Mr. Tidwell decided to volunteer some of the most important state evidence. The conviction and trustee evidence came out during trial.[86] Investigator Earley recently testified, however, that Mr. Tidwell had some type of "I'll scratch your back and you'll scratch mine" relationship with Sheriff Ford.[87] Kenny Parsons was apparently a jail trustee, in a program run by his father, when he volunteered evidence years after the murder.

The Supreme Court has "long recognized the serious questions of credibility informers pose."[88] In addition to the inability to challenge the veracity of the confession, failure to disclose incentives deprived the jury of the "customary, truth-promoting precautions" that generally accompany the use of informant evidence.[89]

The State failed to disclose the photo lineup identification of Mr. Brown. This evidence deprived Mr. Brown of the ability to challenge his identification.[90] The testimony that the photo lineup occurred at all directly contradicted the most powerful circumstantial evidence against Mr. Brown – that he appeared with confessed murderer Mr. Vaughn at Mr. Tidwell's home the night of the murder, 200 yards from Ms. Holmes's house, "wild-eyed" and looking for money.[91]

Mr. Brown proved the three components of a true *Brady* violation: the existence of exculpatory or impeaching evidence, willfully or inadvertently suppressed by the state, and

---

[86] Doc. No. 11-6, p. 12.

[87] Doc. No. 45, p. 19.

[88] *Banks v. Dretke*, 540 U.S. 668, 701 (2004).

[89] *Id.*

[90] *Briscoe v. County of St. Louis, Missouri*, 690 F.3d 1004, 1012 (8th Cir. 2012) (discussing how courts evaluate the reliability of photo line-up identifications).

[91] Doc. No. 11-5, pp. 149-150.

resultant prejudice.[92]  Mr. Brown does not have to prove that he "more likely than not" would have been acquitted but for the *Brady* violations.[93]  "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict."[94]

Standing alone, the most serious *Brady* violations in this case would require a new trial. Considering the materiality of each piece of evidence cumulatively, rather than in isolation, lays bare the extent to which the Brady violations undermine confidence in Mr. Brown's conviction.[95]

### 2. *Giglio v. United States*

Under *Giglio*, the government must disclose evidence impacting the credibility of prosecution witnesses.[96]  This type of evidence generally falls within *Brady* and is subject to the same materiality standard.[97]  Undisclosed *Brady/Giglio* evidence is material when the government's failure to disclose the evidence undermines confidence in the outcome of the trial.[98]

Lee and Kenny Parsons's undisclosed interactions with police fall under *Giglio/Brady*. Kenny Parsons's severe drug use and mental illness also impacted his credibility.

The prosecutor denied "knowledge of any prior records of criminal conviction of witnesses."[99]  Yet Mr. Tidwell was a trustee released from a twenty-year sentence at the Sheriff's

---

[92]*Strickler*, 527 U.S. at 281-282.

[93]*Smith v. Cain*, 565 U.S. 73 (2012).

[94]*Wearry*, 136 S. Ct. 1002, 1006 (2016) (quoting *Smith v. Cain*, 565 U.S. 73 (2012)).

[95]*Id.* at 1007 (2016) (Courts must view the materiality of Brady violations cumulatively, rather than in isolation.)

[96]*United States v. Morton*, 412 F.3d 901, 906 (8th Cir. 2005).

[97]*United States v. Garcia*, 562 F.3d 947, 952 n.7 (8th Cir. 2009).

[98]*Youngblood*, 488 U.S. at 57.

[99]Doc. No. 1, p. 326-327.

request when he came forward.  Kenny Parsons had multiple convictions, and was in jail when asked to testify.

Ms. Bryant had an undisclosed familial relationship with Investigator Earley.  Her brother lived with Investigator Earley and was apparently involved in taking her statements.

While these might be minor issues compared to the previously outlined *Brady* violations, they are still part of the overall record to consider in this case.

### 3.  *Napue v. Illinois*

*Napue* prohibits the use of false evidence to obtain a conviction, and applies even when the state does not solicit the false evidence, but merely allows it to go uncorrected.[100]  It appears that Mr. Tidwell offered a key piece of false evidence when he testified.  The State also allowed to go uncorrected false testimony about when Mr. Vaughn confessed and to whom he confessed.

Mr. Tidwell either lied about crucial evidence during Mr. Brown's trial or he lied during the evidentiary hearing.  Mr. Tidwell testified that Mr. Vaughn came to Mr. Tidwell's house the night of the crime, introduced him to Mr. Brown, and asked for money.[101]  Placing Mr. Brown with someone who "confessed" to the crime, 200 yards from Ms. Holmes's house, on the night of the crime, "wild-eyed" and looking for money, was likely the strongest circumstantial evidence against Mr. Brown.  Now it appears that this testimony was probably false.

Mr. Tidwell now swears Investigator Earley mentioned Mr. Brown to him during an undisclosed, suggestive photo line-up.  So, Mr. Vaughn did not introduce Mr. Tidwell to Mr.

---

[100]*Id.*

[101]Doc. No. 11-6, pp. 15-17, 25-26.

Brown, as Mr. Tidwell previously told the jury. He had no idea who Mr. Brown was until law enforcement identified him.[102]

When questioned shortly after the crime, specifically about Mr. Vaughn, Mr. Tidwell said he had his own problems and did not have anything to share. Having information that both Mr. Vaughn and Mr. Brown were at his house, 200 yards from Ms. Holmes's house, the night of the murder, would seem quite significant.

Based on this record, Mr. Brown has not established a *Napue* violation based on Mr. Tidwell's testimony. It seems unlikely Mr. Tidwell would fabricate the photo-lineup-identification story at this juncture. Regardless, Mr. Tidwell's current story does not add confidence to Mr. Brown's verdict.

More troubling was the State's failure to correct false or misleading testimony regarding Mr. Vaughn's confession. Both Chief Poole and Lt. Bradshaw's testimony left the impression that Mr. Vaughn decided to confess to law enforcement spontaneously.[103] The State, on direct examination, left the same impression when taking Mr. Vaughn's plea and then reading it to Mr. Brown's jury.[104] We now know that was not the case.

### 4. *Arizona v. Youngblood*

A state denies a criminal defendant's right to due process when the state destroys potentially useful evidence in bad faith.[105] The duty to disclose or preserve potentially exculpatory evidence extends to investigating officers.[106]

---

[102]Doc. No. 45, pp. 14-15.

[103]Doc. No. 11-5, pp 180-181, 191, 203-204.

[104]Doc. No. 11-6, pp. 220-222.

[105]*Youngblood*, 488 U.S. at 58.

[106]*Briscoe v. County of St. Louis, Missouri*, 690 F.3d 1004, 1013 (8th Cir. 2012).

Negligently failing to refrigerate semen samples, and disclosing the failure to a defendant before trial, is not bad faith.[107]  Destroying decade-old evidence according to normal police procedures is not bad faith.[108]  Even recklessly destroying evidence, without more, does not establish bad faith.[109]  The destruction of evidence in this case, however, is troublesome.

Here, the State used an undisclosed informant or agent to get a confession from a mentally deficient pretrial detainee who was represented by counsel.  That confession was the only direct evidence against Mr. Brown.  The State recorded the undisclosed informant eliciting the confession.  Instead of disclosing or preserving the recording, the deputy prosecutor destroyed it.  This after the deputy prosecutor reviewed the recording for evidentiary value.[110]  This course of action is "conscious shocking" and compels a finding of bad faith.

The presence or absence of bad faith "necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[111]  The record contains limited information about the content of the recording.  Robin Wynne, the deputy prosecuting attorney who may be able to shed light on the exculpatory value of the recording, did not testify during evidentiary hearings before Judge Volpe and Judge Kearney.[112]  Regardless, the recording would evidence the use of an informant, at a minimum, which raises "serious questions of credibility."[113]  Without the informant evidence, counsel could do little to

---

[107]*Youngblood*, 488 U.S. at 58.

[108]*Illinois v. Fisher*, 540 U.S. 544, 545 (2004).

[109]*United States v. Tyerman*, 701 F.3d 552, 560 (8th Cir. 2012).

[110]*Jimerson*, 5:15CV00208-BSM-JTK at 51, p. 170.

[111]*Briscoe*, 690 F.3d at 1013 (quoting *Youngblood*, 488 U.S. at 56).

[112]I recognize how uncomfortable it would be to call Justice Wynne, now sitting on the Arkansas Supreme Court, to testify about alleged, decades-old, prosecutorial misconduct.

[113]*Banks*, 540 U.S. at 701.

challenge the veracity of Mr. Vaughn's confession.  Instead, the jury heard a court-declared hostile witness deny he made the statements.[114]  Mr. Brown's counsel did not have a single cross-examination question for Mr. Vaughn after the State read the substance of his confession to the jury.[115]

The facts in this case sufficiently establish bad faith in the destruction of critically important evidence.  The only direct evidence against Mr. Brown was the confession of Mr. Vaughn, who, arguably, had the IQ of a seven-year-old.  He was in jail, with representation of counsel attached, when the state sent in an undisclosed informant or agent, who possibly told Mr. Vaughn to confess to avoid the death penalty.  The state destroyed the recording of the confession.  Mr. Vaughn recanted almost immediately.

The only reliable circumstantial evidence in this case points to Mr. Early.  The testimony of the four witnesses placing Mr. Brown with his co-defendants the night of the murder is questionable at best, likely the result of multiple constitutional violations. Under these circumstances, Mr. Brown has adequately proven this *Youngblood* claim.

### D.      State's Reliance on Procedural Default

As a final note, I question the State's reliance on procedural default in this case.  A federal court cannot grant habeas relief unless the petitioner exhausts state-court remedies,[116] there is an absence of available state corrective process,[117] or circumstances exist to render the

---

[114]Doc. No. 11-6, p. 197.

[115]Doc. No. 11-6, p. 242.

[116]28 U.S.C. § 2254(b)(1)(A).

[117]28 U.S.C. § 2254(b)(1)(B)(i).

process ineffective.[118]  This is the rare case where the State's reliance of the exhaustion requirement is unfounded.

The adequacy of state procedural bars to the assertion of federal rights is itself a federal question.[119]  When, as here, a state conceals a constitutional violation until a petitioner cannot exhaust state remedies through any state process, the state renders those processes ineffective to protect a petitioner's rights.[120]  Generally, instead of applying the deferential 28 U.S.C. § 2254(d) standard, the court reviews the claim *de novo*.[121]

## Conclusion

Absent the procedural hurdles behind Mr. Brown, this case is fairly cut and dried.  The State failed to disclose, concealed, and destroyed the most important exculpatory and impeachment evidence in the case.  The concealed evidence related to the State's most critical evidence of guilt.  There was little other reliable evidence of guilt. The constitutional violations in this case thoroughly undermine confidence in Mr. Brown's conviction.  There is a reasonable likelihood that the constitutional violations affected the judgment of the jury to the point the outcome would have been different.  Mr. Brown has likely also shown that with Mr. Early's confession and the new eyewitness testimony, no reasonable juror would have found Mr. Brown guilty beyond a reasonable doubt.

---

[118]28 U.S.C. § 2254(b)(1)(B)(ii).

[119]*Lee v. Kemna*, 534 U.S. 362, 375 (2002).

[120]See *Cone v. Bell*, 556 U.S. 449, 476 (2009) (When state prosecutors withhold *Brady* evidence, state procedural rejection of the *Brady* claim does not bar federal habeas review).

[121]*Id*. at 472.

For these reasons, I decline to adopt Judge Volpe's Recommendation.[122]  Petitioner John Brown's petition for writ of habeas corpus is GRANTED.[123]  His Motion to Authorize Discovery, Compel a Search for Evidence, and Order DNA Testing is DENIED as moot.[124]

Mr. Brown's murder and aggravated robbery convictions are VACATED, subject to retrial.  Respondent has thirty days from the entry of this order to release Mr. Brown or institute new criminal proceedings against him.

IT IS SO ORDERED this 21st day of August, 2018.


/s/ Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[122]Doc. No. 45.

[123]Doc. No. 1.

[124]Doc. No. 33.